# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| E.R., | |
| Plaintiff, | 3:14-cv-1657 (CSH) |
| v. | |
| UNITEDHEALTHCARE INSURANCE COMPANY, | **March 30, 2017** |
| Defendant. | |

## RULING ON DEFENDANT'S AND PLAINTIFF'S CROSS MOTIONS FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

In this action, Plaintiff E.R. brings suit against her insurer for denying coverage of residential treatment for an eating disorder. Plaintiff asserts that the denial was both arbitrary and capricious because the treatment was "medically necessary" as defined in Plaintiff's insurance policy, which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff argues the treatment was "medically necessary" given Plaintiff's medical history, record and condition at the time of the denial. Plaintiff and Defendant, UnitedHealthcare Insurance Company ("United"), have each moved for summary judgment. This Ruling resolves these fully briefed cross-motions.

## I.    Factual Background

On January 1, 2013, Plaintiff was enrolled as a beneficiary in a UnitedHealthcare Choice Plus Plan issued to a company called I.T. Xchange Corp. Doc. 34 ¶ 3. Pursuant to the Group Enrollment Agreement between United and I.T. Xchange, United issued a Certificate of Coverage to Plaintiff that set forth the terms, limitations, conditions, and exclusions of coverage under the

policy (collectively the "Policy" or "Plan").  Ex. A at 003[1]; Doc. 34 ¶ 4.

A.      **Plaintiff's Policy**

The Plan states that the Certificate of Coverage "is a part of the policy" providing benefits to "Covered Persons, subject to the terms conditions, exclusions, and limitations of the Policy."  Ex. A at 004.  The Certificate also states that the Policy includes, in addition to the Certificate, the Group Policy, Schedule of Benefits, Enrolling Group's applications, riders and amendments.  *Id*. The Plan provides that United has "discretion" to "[i]nterpret Benefits and the other terms, limitations and exclusions set out in this *Certificate*, the *Schedule of Benefits* and any Riders and/or Amendments" as well as to "[m]ake factual determinations relating to Benefits."  *Id.* at 008, 059. The Plan further provides that United "may delegate this discretionary authority [to determine benefits] to other persons or entities that may provide administrative services for this Benefit plan, such as claims processing" and that the "identity of the service providers and the nature of their services may be changed from time to time in [United's] discretion."  *Id.* at 008, 059.

The Plan covers "Mental Health Services" provided by out-of-network providers so long as those services are "Covered" under the terms of the Plan.  *Id.* at 006, 008-10, 017, 030.  Mental Health Services include "those received on an inpatient basis in a Hospital or Alternate Facility, and those received on an outpatient basis in a provider's office or at an Alternate Facility," which includes "[s]ervices at a Residential Treatment Facility."  *Id.* at 017.  However, only services that

---

[1] Citations to the Plan are to Doc. 27-1 Exhibit A to the Declaration of Cheryl F. Knoblauch filed by Defendant in support of its Motion for Summary Judgment.  Citations to the administrative record are to Doc. 27-2 through Doc. 27-13 Exhibit B to Ms. Knoblauch's Declaration.  Exhibits A and B to Ms. Knoblauch's Declaration consist of Bates numbered-stamped pages.  The Court omits the "UNITED" designation and the first three leading zeros of these digits in its citations to these pages.

are "Medically Necessary" are covered by the Plan. *Id.* at 012, 063, 066. A service is "Medically Necessary" if it is (1) "[p]rovided for the diagnosis, treatment, cure [sic] relief of a health condition, illness, injury or disease"; (2) "not for experimental investigational or cosmetic purposes," except as provided under "GS 38-3-255"; (3) "[n]ecessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease or its symptoms"; (4) "[w]ithin generally accepted standards of medical care in the community"; and (5) "[n]ot solely for the convenience of the Covered Person, the Covered Person's family or the provider." *Id.* at 066.

The Plan also provides for a "Mental Health/Substance Use Disorder Designee" who is the individual or organization designated by United "that provides or arranges Mental Health Services" for which benefits are available under the Policy. Ex. A at 066. This person or organization "determines coverage for all levels of care" related to Mental Health Services. *Id.* at 017. The Plan encourages the policyholders to contact their Mental Health/Substance Use Disorder Designee "for referrals to providers and coordination of care." *Id.*

United apparently designated United Behavioral Health ("UBH") as its Mental Health/Substance Use Disorder Designee. Ex. A at 017; Ex. B at 146, 1081. UBH made coverage decisions for Plaintiff in this case, determining the appropriate level of care. *See*, *e.g.*, Ex. B at 146-47, 1081-82. In making such decisions, UBH informed Plaintiff that it applied its own internal guidelines ("UBH Guidelines") to determine whether the level of care was "medically necessary." *Id.* at 146, 1081. The UBH Guidelines provide that in order for residential treatment to be provided any one of the following criteria must be met by the insured: (1) the person must be "experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting"; (2) "[t]here is an imminent risk that severe, multiple and/or complex

pychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of functioning to undermine treatment in a lower level of care"; or (3) the person "has a co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary." *Id.* at 1038. If one of the three criteria is met, then the insured must also meet seven other criteria for residential treatment to be necessary: (1) certain requirements for care must be met within 48 hours of admissions, (2) the person must not be at imminent risk of serious harm to self or others, (3) required psychiatric evaluations and consultations must occur at least twice per week, (4) the facility must have available all general medical services, (5) there must be collaboration to update the treatment plan so that the continued treatment "is required to prevent acute deterioration or exacerbation of the" person's current condition, (6) there must be collaboration to update a discharge plan, and (7) certain requirements exist for the discharge plan. *Id.* at 1038-1040.

### B.    Medical History of Plaintiff

Plaintiff is a nineteen-year-old woman who stated that her eating disorder began in sixth grade and that she had been diagnosed with Anorexia Nervosa. Ex. B at 667. Her family has a history of mental illness. *Id.* at 668, 1132. Various intake assessments for Avalon Hills Treatment Center ("Avalon Hills") detail Plaintiff's long history battling the eating disorder.[2] *See, e.g.*, *id.* at 667-670. Plaintiff's disorder "took the form of severe restriction and overexercise," she was a competitive athlete, excellent student and described herself as "very 'competitive and perfectionistic.'" *Id.* at 667. However, "socially [E.R.] has had very few close friends." *Id.* at 687.

---

[2] Unless otherwise noted the information regarding Plaintiff's medical history comes from these intake assessments that are part of the administrative record.

-4-

In 2009, at the age of twelve, Plaintiff's mother noticed that Plaintiff was restricting her caloric intake and by July of 2009 Plaintiff weighed just 75 pounds. *Id.* at 685. Plaintiff began the Maudsley family-based treatment program and some meals would take up to six hours to complete. *Id.* at 549.

Between April and June 2011, Plaintiff participated in the intensive outpatient program ("IOP") at the Renfrew Center for three days per week. Ex. B at 685-86. Renfrew determined she was not making enough progress after three months of treatment as an IOP and referred her to its day program. *Id.* This surprised Plaintiff and after an outburst, in which she threw a phone at someone, she was informed she was no longer welcome at the facility. *Id.* She was subsequently admitted to Silver Hill Hospital in Connecticut for a one week period. *Id.* at 686. Upon discharge, Plaintiff worked with an outpatient therapist but her weight dropped again. *Id.*.

In December 2011, she began treatment at the Wilkins Center for Eating Disorders in Greenwich, Connecticut where she was treated until May 2012. Ex. B at 686. During that time Plaintiff's mother noted that Plaintiff's behavior got "more bizarre and she became more rigid" and Plaintiff, although not allowed to play soccer or run track, found ways to go running by lying or sneaking out and would throw out food when her parents were not looking. *Id.* In May 2012, Plaintiff was admitted to a residential treatment program at Klarman Eating Disorder Center at McLean Hospital in Boston, but she tried to run away prior to admission and did run away after admission. *Id.* As a result, the hospital would no longer treat her. *Id.* She was subsequently admitted to the pediatric inpatient ward at Massachusetts General Hospital in Boston where she continued to hide food and hold urine to manipulate her weight. *Id.* She was placed on 24-hour supervision. *Id.*

Upon discharge from Massachusetts General Hospital, Plaintiff was admitted to New York Presbyterian Hospital for an eighteen-day stay as an inpatient. Ex. B at 686. At one point during this stay she needed a nasogastric tube placed, which she resisted, requiring that she be sedated for insertion. *Id.* Once she reached 94 pounds, she was discharged and continued treatment at Timberline Knolls Residential Treatment Center in Illinois. *Id.* After five weeks of treatment, benefits were denied to her and she was discharged on July 25, 2012. *Id.* Plaintiff thereafter returned to treatment as an outpatient at Renfrew Center from August 1, 2012 until September 14, 2012. *Id.* She returned to school, including playing soccer but was soon injured and could not play, which devastated her. *Id.*

### C.    Plaintiff's Admission to Avalon Hills Treatment Center

 On November 14, 2012, Plaintiff was admitted to Avalon Hills in Logan, Utah for inpatient residential treatment of Anorexia Nervosa and Generalized Anxiety Disorder. Ex. B at 548, 1088-95. Upon admission, Plaintiff weighed 94.4 pounds, reached 60.5 inches in height, had a BMI of 18.13 and suffered from bradycardia (abnormally slow heart rate) and orthostatic hypotension (low blood pressure which causes dizziness). *Id.* at 548-49, 669. She had suffered numerous side effects of her disorder, having not grown since she was twelve years old, not yet had a menstrual cycle, and having impaired judgment and insight. *Id.* at 549, 668. She refused psychiatric medication, reported being sad for many days in a row, constantly worrying and not sleeping, with a history of past suicidal ideation. *Id.* at 668.

The psychiatric intake treatment team at Avalon Hills recommended long term residential treatment designed specifically to treat eating disorders at that time. Ex. B at 668-70. Goals for Plaintiff and her parents were for Plaintiff to reach an initial target weight of 102 to 112 pounds,

Plaintiff to be educated and challenged on allowing all foods in moderation, moved through the program maintaining goal weight, and be provided individual and group therapy. *Id.* at 548-49. Plaintiff's first few months in treatment were met with resistance from Plaintiff and Plaintiff continued to try and over exercise, manipulate her meal plan, or refuse medication. *Id.* at 654-56, 693-99.

      **D.**     **Plaintiff's Treatment and Coverage Decisions by UBH**

When Plaintiff was admitted to Avalon Hills she was not insured by United, but by another insurer, which had approved benefits for residential treatment from admission on November 14, 2012 until December 31, 2012. Doc. 32 ¶ 46. On January 7, 2013, Mark Leudde, LPC (Licensed Professional Counselor) was assigned as Plaintiff's care advocate. Ex. B at 1088. Leudde conducted an Initial Facility-Based Review on behalf of UBH. *Id.* UBH is the entity responsible for making benefit coverage determinations for mental health and substance abuse services provided to United policyholders. *See id.* at 1085. Leudde reported in his review that Plaintiff's height was 61 inches and weight was 107 pounds, 102% of her ideal body weight. *Id.* at 1091. He also reported that Plaintiff restricted food intake and over exercised but did not purge, binge, or have suicidal thoughts or depression. *Id.* at 1091-92. He further reported that Plaintiff had family issues, suffered from anxiety and impulsivity, and had to be supervised at meals. *Id.* Leudde approved coverage for Plaintiff at the residential treatment level of care ("RTC") from January 1, 2013 to January 7, 2013 on an administrative basis to allow an opportunity for a medical clinician to review the clinical information. *Id.* at 1094.

On January 8, 2013, after Plaintiff had returned from a five-day pass at home with her family, Ex. B at 1103, Dr. Natalie Fitzgerald, a psychologist, performed a concurrent clinical review

of Plaintiff's treatment records on UBH's behalf.  Ex. B at 1096-1104, 1154-63.  She noted that Plaintiff had sleep issues, waking 2-3 times per week where she would exercise and/or pace around the room, *id.* at 1102, and that Plaintiff was going to go on another 5-day pass to spend time with her family at the end of January.  *Id.*  Case notes from January 8, 2013 also reflected that Plaintiff had "poor impulse control" and had lost weight while on a home pass with family.  *Id.* at 1156. Plaintiff's continued RTC treatment until January 10, 2013 was approved with an estimated stay of 2.5 weeks.  *Id.* at 1161.  The approval, as noted by Dr. Fitzgerald, was "per consumer's benefit plan and LOC [level of care] guideline."  *Id.* at 1163.

On January 11, 2013, Dr. Natasha Bosch, LCPC performed a concurrent facility-based review.  Ex. B at 1163-71.  She noted that Plaintiff attempted to over exercise at times, had poor body image, was working on improving insight and judgment, and was argumentative about her meal plan at times.  *Id.* at 1166.  Dr. Bosch approved further coverage for treatment at the RTC level until January 15, 2013, but recommended that Plaintiff could be stepped down to the partial hospitalization level of care.  *Id.* at 1168-69.  A later concurrent review notes that on January 11, Plaintiff was within weight range, her meal plan was continuously being decreased, and Avalon Hills was trying to find her maintenance weight.  *Id.* at 1176.  She was able to stick to a meal plan but only in a structured setting, had a negative body image, and panicked at swimming with male peers.  *Id.*  It further noted that on January 11, Plaintiff had an anxious mood and was over exercising due to anxiety about returning home.  *Id.*

On January 15, 2013, Dr. Fitzgerald conducted a concurrent facility-based review.  Ex. B at 1179-87.  She noted that Plaintiff was "highly anxious, but" has an "increasingly brighter affect" and that her "anxiety has decreased."  *Id.* at 1182.  She also noted, consistent with the prior reviews,

that the barrier to discharge was that Plaintiff's symptoms were not yet manageable. *Id.* at 1183. The review stated that Plaintiff was scheduled to return on a home pass for a week in the end of January, and if she did well would be stepped down to partial hospitalization. *Id.* However, Plaintiff was doing a lot of over exercising with anxiety about returning home. *Id.* at 1184. The notes repeated the same concerns from the prior concurrent facility-based review by Dr. Bosch that Plaintiff was within weight range and trying to find a maintenance weight, but struggling to eat the required amount of food outside of a structured environment. *Id.* Coverage was approved until January 18, 2013. *Id.* at 1186.

On January 18, 2013, Dr. Fitzgerald performed another concurrent facility-based review. Ex. B at 1188-96. Avalon Hills' Weekly Treatment notes reflected that on January 17, 2013, Plaintiff was making progress on primary treatment goals, beginning to have more freedom with meal planning, which came with increased anxiety, and that her over exercise behaviors were decreasing and awareness improved. *Id.* at 721. The notes reflected that the plan was to "[d]ecrease structure" and monitor slowly and closely. *Id.* Plaintiff was also observed under plating and closely watching others, body checking, over exercising (though she showed more awareness about these movements), and avoiding challenging foods. *Id.* at 721-23. Avalon Hills' Psychiatrist Progress Notes from January 17, 2013 reflected that Plaintiff failed to recognize her over exercising behaviors, such as doing cartwheels, standing, shaking her leg, and squeezing inner thighs. *Id.* at 675. In Dr. Fitzgerald's review, she noted that Plaintiff's mood was low, Plaintiff's home pass had been postponed due to her behavior, and Plaintiff had poor insight into her over exercising. *Id.* at 1190, 1192. Plaintiff was still orthostatic. *Id.* at 1190. The review notes also stated that a dietician was working with Plaintiff and Plaintiff was choosing her own foods and keeping a log for over

exercising, which had been decreasing, but the log recently did not match a staff report. *Id.* at 1192. Coverage was approved until January 22, 2013. *Id.* at 1195, 1202.

On January 22, 2013, Dr. Fitzgerald performed another concurrent facility-based review. Ex. B at 1197-1206. She noted that Plaintiff's anxiety had increased because of the home pass's cancellation and Plaintiff was not sleeping well. *Id.* at 1200. The review also reflected that Plaintiff was within her weight range, with her weight trending down as the dietician tried to find a maintenance weight and caloric intake for Plaintiff, and Plaintiff had made progress on eating desserts. *Id.* at 1202. However, Plaintiff had a rock fall out of her pocket on January 21, 2013 when she stood for vitals and was still having over exercising behaviors. *Id.* Avalon Hills' Nursing Progress Notes reflected that Plaintiff referred to it as her "worry rock," she wanted to keep it, and admitted she was using it to try to manipulate her weight. *Id.* at 639. Coverage was approved until January 24, 2013. *Id.* at 1205.

Plaintiff was able to go skiing for her birthday on January 24, 2013. Ex. B at 1060-61. She did well in the morning, but in the afternoon of her birthday she was pushing herself and boundaries and getting away from the group. *Id.* On the same day, Dr. Fitzgerald performed a concurrent facility-based review. Ex. B at 1116-25. The review reflected that Plaintiff was anxious about being unable to go home and processing putting the rock in her pocket. *Id.* at 1118. Avalon Hills' Weekly Treatment notes remarked that Plaintiff had a difficult week and, referred to the rock incident, noting that she had been trying to manipulate her weigh-in out of fear of having lost weight and being put on a higher meal plan. *Id.* at 729. Avalon Hills' Nursing Progress Notes also reflected that Plaintiff was called out for certain behaviors at meals during the week. *Id.* at 637. Plaintiff's weight had decreased to 105 pounds, 100% of her ideal body weight. *Id.* at 1117. Coverage was approved until January 28, 2013. *Id.* at 1122. Dr. Fitzgerald noted that the peer-to-peer review was postponed

because they were determining an alternative treatment option and whether Plaintiff could stay with other family members while the family addresses eating behaviors in the home.  *Id.* at 1124.

On January 28, 2013, Dr. Fitzgerald conducted a final concurrent facility-based review.  Ex. B at 1125-34.  She noted that Plaintiff's weight was up to 106, *id.* at 1127, that Plaintiff was still anxious but seeing improvements and sleeping okay, *id.* at 1128.  The review also reflected that on January 24, 2013, Plaintiff was trying to under measure fluids with meals, had been body checking in reflective surfaces, picking out cashews from mixed nuts thinking they have higher fat, and had been struggling with regular over exercise urges.  *Id.* at 1131.  However, the review noted that Avalon Hills felt Plaintiff was turning the corner mentally from contemplative to preparation.  *Id.* The review concluded that the case would be sent for peer review as Plaintiff was not meeting the medically necessary criteria.  *Id.* at 1133.

On January 29, 2013, Dr. Lee Becker, a Medical Director for UBH,  conducted a peer-to-peer review of Plaintiff's treatment, in part through a conversation with Dr. Sara Boghosian of Avalon Hills.  Ex. B at 1135-37.  In notes regarding the call and decision, Dr. Becker described Plaintiff's history at the facility in detail, noting that she tried to weigh in with a rock in the prior week but was "now more ready for change," and that Plaintiff had a "cognitive understanding of the eating disorder but" had not "seen her over exercising as a problem."  *Id.* at 1136.  Plaintiff's family had initially resisted the treatment plan, but there had been improvements with the facility holding the line with Plaintiff and the family was learning from the facility.  *Id.*  He noted that Plaintiff had gained approximately 15 pounds with treatment, was highly monitored, still had orthostatic vital sign changes about 50% of the time, and still had urges to restrict as a reaction to negative feedback from others.  *Id.*  Plaintiff also had a visit with her mother in the coming week and if it went well, Dr.

Boghosian indicated they would consider stepping Plaintiff down to partial hospitalization, which the facility has available.  *Id.*

Dr. Boghosian's notes for the peer-to-peer review with Dr. Becker reflected that she informed Dr. Becker of concerns about Plaintiff's frequent urges to restrict food intake and over exercise and Plaintiff's own poor mental image of herself as needing to tone up despite already having good muscle tone.  *Id.* at 823.  Plaintiff's weight was down 1.6 pounds that day, likely in response to feedback that her weight had slightly trended up and Dr. Boghosian believed that Plaintiff would be unable to maintain her weight with less structure.  *Id.*  Dr. Boghosian remarked that Plaintiff continued to articulate some ambivalence toward recovery, usually when having a negative body image or conflict within the group, and was often more focused on going home than recovery.  *Id.*  Dr. Boghosian stated that generalized anxiety preceded and served to maintain Plaintiff's eating disorder at times, and that Plaintiff refused medications for the disorder.  *Id.*  She also noted the problems with Plaintiff's family and that Renfrew, the only available step down program near Plaintiff's home, was unwilling to treat Plaintiff due to her past behavior.  *Id.* at 824.  Dr. Boghosian considered Plaintiff to soon be fit for a partial hospitalization program, but remarked that Renfrew would likely not take Plaintiff back and doing such a program at Avalon Hills may be better for her when she is ready.  *Id.*

Based on the above information and a review of Plaintiff's records, Dr. Becker determined that benefit coverage should be denied for January 28, 2013 forward.  He concluded that Plaintiff was (1) more willing to work on joint recovery goals, (2) had very good weight gain, (3) improved in medical concerns, and (4) her recovery was not complicated by ongoing medical or other conditions requiring the intensity of structure and monitoring at the residential treatment center.  Ex. B at 1136-37.  Dr. Becker remarked that treatment could continue in a less intensive setting, which

would initially be approved. *Id.* at 1137. Dr. Boghosian's call notes reflect that Dr. Becker concluded that Plaintiff "does not meet the UBH criteria (not APA) for residential treatment" and that he had focused on her weight status and gains as well as the fact that she was refusing medication in the residential treatment setting. *Id.* at 823.

Plaintiff's mother contacted UBH and spoke to UBH's Care Advocate Carol Williams to object and inform United that partial hospitalization treatment would not be possible. Ex. B at 1044-45. Plaintiff's mother described how Plaintiff had left the prior residential treatment facility in 2012 too early and relapsed. *Id.* Ms. Williams discussed the appeals options for Plaintiff and expressed that being against medication may not be consistent with best practice guidelines. *Id.*

Dr. Becker confirmed the denial with Plaintiff's parents by letter on January 30, 2013, stating that Plaintiff's coverage was being denied based on his "review of the available documentation and all information" that UBH had "received to date." Ex. B at 146. Dr. Becker explained that his determination was to deny benefits from January 28, 2013 forward based on the "lack of medical necessity per UBH Level of Care Guidelines for Mental Health Residential level of care." *Id.* Specifically, Dr. Becker stated that Plaintiff "has been more willing to work on joint recovery goals," had "very good weight gain," had "[i]mprovements in medical concerns," and "it [did] not appear that her recovery [was] complicated by ongoing serious medical or other mental health conditions requiring this intensity of structure and monitoring." *Id.* In his opinion, treatment could "continue in a less intensive setting, such as mental health partial hospitalization program or outpatient mental health session," which UBH would authorize. *Id.*

Plaintiff's parents elected to keep Plaintiff at Avalon Hills at the residential treatment level of care. Ex. B at 1142. On February 4, 2013, Plaintiff (through her parents) sent a letter requesting that United reconsider its decision or, in the alternative, approve treatment at the partial

hospitalization level.  *Id.* at 491-92.  Plaintiff viewed this as cost effective because if she was discharged too early she would regress and have to be hospitalized again.  *Id.*  Plaintiff's parents indicated that they would cover the difference for Plaintiff's treatment at the residential treatment level of care at Avalon Hills.  *Id.* at 821-22.  However, the parties failed to reach an agreeable solution that would allow Plaintiff's care at Avalon Hills at the residential treatment level to continue.  *Id.* at 818-22, 1222-23.

Plaintiff's care at Avalon Hills continued and as part of this treatment Plaintiff was released on two home passes:  a nine-day home pass on February 21, 2013 during which Plaintiff maintained her weight appropriately, Ex. B at 741, 746, and a two-week home pass starting March 14, 2013, during which she attended school and met with her outpatient team, *id.* at 749, 753.  On or around April 4, 2013, Plaintiff and Avalon Hills began preparing for her discharge.  *Id.* at 761.  Plaintiff was discharged on April 8, 2013.  *Id.* at 156, 1151.

Plaintiff's Dietary Discharge Summary detailed her medical history and treatment at the facility.  Ex. B at 546-47.  It remarked on her efforts to ditch food during meal times in order to restrict food intake and restrict her fluid intake.  *Id.*  It also reflected that such behaviors ceased over time.  *Id.* at 547.  The discharge summary stated that once she reached the middle of her weight range, she was decreased with her meal plan.  *Id.*  It also noted that she was advanced and eating intuitively at all meals since the beginning of February and maintaining her weight appropriately since that time.  *Id.*

Plaintiff submitted a formal appeal, which United accepted, on March 27, 2014.  Ex. B at 156, 1151.[3]  The letter detailed Plaintiff's medical history and treatment for her mental illness.  *Id.*

---

[3] Avalon Hills, in conjunction with Plaintiff's appeal, did not submit additional materials justifying continuing treatment of Plaintiff at the residential treatment level after January 28, 2013.

at 157-62. It also asserted that Plaintiff's treatment was medically necessary under the American Psychiatric Association Practice Guidelines for the Treatment of Patients with Eating Disorders ("APA Guidelines"). *Id.* at 165-66. United referred the appeal to Dr. Theodore Allchin, who upheld UBH's initial adverse determination on April 10, 2014. *Id.* at 1151-52. He concluded that "based on the clinical information provided" Plaintiff did not meet the medical necessity criteria for residential mental health treatment per the UBH Guidelines. *Id.* at 1151. He noted specifically that: (1) she was not a risk of harm to herself or other, (2) there were no medical issues, (3) her weight was appropriate, (4) she was participating in her recovery, (4) she tolerated several out-of-state passes, (5) there was no evidence of a need for 24-hour supervision, and (6) she could have been safely treated at a less restrictive level of care such as partial hospitalization. *Id.* at 1151-52. On April 29, 2014, UBH advised Plaintiff's counsel by letter of Dr. Allchin's decision, repeating the same conclusions he noted in his review. *Id.* at 1081-82.

Plaintiff filed her Complaint in this action [Doc. 1] on November 7, 2014, alleging that Defendant United improperly denied her benefits in violation of 29 U.S.C. §§ 1132(a), (e), (f) and (g) of ERISA. *Id.* at 1. Plaintiff also made a claim for equitable relief pursuant to 29 U.S.C. § 1132(a)(1)(B). *Id.* at 5-6. Discovery closed on January 27, 2016 and the parties filed cross motions for summary judgment on April 21, 2016. Docs. 20, 24-25. The parties completed full briefing on those motions on May 26, 2016. Docs. 24-29, 32-37.

## II.    Standard for Summary Judgment

The principles governing summary judgment motions are well established and equally applicable to the present case even though it involves the review of an administrative record. *Smith v. Champion Int'l Corp.*, 573 F. Supp. 2d 599, 607 (D. Conn. 2008) (citing *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 (2d Cir. 2006)). A motion for summary judgment shall

be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must "demonstrate the absence of any material factual issue genuinely in dispute" to be entitled to summary judgment. *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (citation and internal quotation marks omitted).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute concerning the material fact is genuine. *Id.* All inferences and ambiguities must be viewed in the light most favorable to the nonmoving party. *Rogoz v. City of Hartford*, 796 F.3d 236, 245-46 (2d Cir. 2015). This is true even though the Court is presented with cross-motions for summary judgment. *Larsen v. Prudential Ins. Co. of Am.*, 151 F. Supp. 2d 167, 171 (D. Conn. 2001) (citing *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)). "The movant's burden does not shift when cross-motions for summary judgment are before the Court. Rather, each motion must be judged on its own merits." *Id.* (citing *Assoc. of Int'l Auto Mfrs., Inc. v. Abrams*, 84 F.3d 602, 611 (2d Cir. 1996)). The nonmoving party, "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (citing *Anderson*, 477 U.S. at 248) (summary order). "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)).

-16-

### III.    Standard of Review Under ERISA

The Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v Bruch*, 489 U.S. 101, 115 (1989); *see also Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009); *Larsen*, 151 F. Supp. 2d at 171.  Where "written plan documents confer upon a plan administrator discretionary authority to determine eligibility" the determination is "not disturb[ed] . . . unless it is arbitrary and capricious." *Hobson*, 574 F.3d at 82 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)) (internal quotation marks omitted).   Both parties agree, and this Court so holds, that the ERISA plan at issue confers discretionary authority to determine benefit eligibility upon the plan administrator.  Doc. 24-2 at 14; Doc. 29 at 16-17.[4]

Under arbitrary and capricious review, a district court may overturn an administrator's decision to deny ERISA benefits "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law.  This scope of review is narrow; thus [the Court] is not free to substitute [its] own judgment for that of the insurer as if [it] were considering the issue of eligibility anew." *Guad-Figueroa v. Metro. Life Ins. Co.*, 771 F. Supp. 2d 207, 215 (D. Conn. 2011) (quoting *Hobson*, 574 F.3d at 83-84) (internal quotation marks omitted).  "Substantial evidence 'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the

---

[4] The grants of discretion as part of the plan may be found at Ex. A at 008, 059 ("We have the sole and exclusive discretion to . . . [i]nterpret Benefits under the Policy," "[i]nterpret the other terms, conditions, limitations and exclusions set out in the Policy," and "[m]ake factual determinations related to the Policy and its Benefits").  Similar language has been held as a sufficient grant of discretionary authority by the Second Circuit. *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622-23 (2d Cir. 2008).

decisionmaker and requires more than a scintilla but less than a preponderance.'" *Id.* (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).  This is much more than a "perfunctory review of the factual record," the review "must include a 'searching and careful' determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary." *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 317 (S.D.N.Y. 2009) (quoting *Rizk v. Long Term Disability Plan of Dun & Bradstreet Corp.*, 862 F. Supp. 783, 789 (E.D.N.Y. 1994)).

The Second Circuit has further explained that "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate."  *Hobson*, 574 F.3d at 82-83 (quoting *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008)) (internal quotation marks omitted).  A conflict of interest shown by plaintiff to have affected the administrator's choice is "only one of 'several different considerations' that judges must take into account when 'review[ing] the lawfulness of benefit denials.'" *Id.* (quoting *McCauley*, 551 F.3d at 133).  However, where there is no evidence that the conflict actually affected the administrator's decision, a court may determine that there is no weight to be given to the conflict as a part of the court's decision.  *Id.*

## IV.    Plaintiff's First Claim

### A.    Conflict of Interest

Plaintiff has asserted, conclusorily, that a conflict of interest exists and must be taken into account in the Court's analysis of the denial of Plaintiff's claim.  Doc. 24-2 at 15.  Defendant does not dispute that this conflict existed but argues that it is irrelevant here because it did not affect the outcome of the decision and Plaintiff does not assert that it did so affect the decision.  Doc. 33

at 24-25.

Defendant is correct that Plaintiff has not argued, shown or pointed to any evidence demonstrating that a conflict of interest affected Defendant's decisions. The Court has not found any evidence demonstrating how such a conflict could have impacted the decisions at issue here. *See, e.g.*, *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 140 (2d Cir. 2010) (describing situations where conflicts of interest would be entitled to weight, such as a history of biased claims administration or an administrator's deceptive or unreasonable conduct). Absent any such evidence, and where Plaintiff has failed altogether to explain how the conflict of interest affected the decisions at issue, the Court declines to afford this conflict of interest significant weight in reviewing the denial of benefits. *See Hobson*, 574 F.3d at 83; *see also Durakovic*, 609 F.3d at 140 ("No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." (citing *Hobson*, 574 F.3d at 83)); *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 218 (2d Cir. 2015) (discussing *Durakovic* and declining to give weight to a similar categorical conflict of interest).

### B.    Application of UBH Guidelines

As a preliminary matter, Plaintiff asserts through its motion for summary judgment and its opposition to Defendant's motion for summary judgment that Defendant was not entitled to, and did not properly, apply the UBH Guidelines to the treatment of Plaintiff. Doc. 24-2 at 15-21; Doc. 35 at 6-10. According to Plaintiff the Policy's definition of "medically necessary" controls and Plaintiff's treatment clearly met the five criteria outlined specifically by that definition. Doc. 24-2 at 16. One of those criteria is that the care will be considered medically necessary if it is within "generally accepted standards of medical care in the community." Ex. A at 066. Plaintiff asserts

that the APA Guidelines supply such standards and should have been applied to Plaintiff's benefit determination.  Doc. 24-2 at 17-20.

Defendant responds that the Policy's definition of "medically necessary" was applied to Plaintiff's case by Dr. Becker and Dr. Allchin and both doctors appropriately applied the UBH Guidelines governing whether residential treatment was medically necessary.  Doc. 33 at 7-8. Defendant asserts that no new terms were added to the Policy based on the UBH Guidelines and that the UBH Guidelines are consistent with those relied upon by Plaintiff (the APA Guidelines).  *Id.* at 15-16.  Defendant also argues that even assuming the UBH Guidelines were inapplicable, residential treatment for Plaintiff was clearly not "medically necessary" as defined within the Policy or through application of the APA Guidelines.  *Id.* at 16-24.  Therefore, there was no abuse of discretion by Defendant in Plaintiff's case.

Plaintiff is correct, and Defendant does not dispute, that the Plan language is generally the most important.  *See US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1548 (2013) ("The plan, in short, is at the center of ERISA.").  However, the language of the Plan here states that there will be a Mental Health/Substance Use Disorder Designee who will determine "coverage for all levels of care."  Ex. A at 017.  It also provides that United has discretion to make factual determinations relating to benefits and to interpret benefits and the terms, limitations, and exclusions set out in the Policy.  *Id.* at 008, 0059.  The Plan further provides that United may delegate this discretionary authority to others and that to receive benefits policyholders must cooperate with those service providers.  *Id.* at 008, 059.  United apparently delegated that discretionary authority to UBH as the Mental Health/Substance Use Disorder Designee[5] allowing UBH to "determine[] coverage for all

---

[5] Plaintiff appears to be correct that there is no direct evidence in the administrative record that UBH was so designated by United.  However, the Policy provided that United could change

levels of care" for Mental Health Services available under the Policy. *Id.* at 017. UBH then establish the UBH Guidelines to use in determining when residential treatment, or any level of care for that matter, is appropriate.

At least one court has rejected an argument similar to that made by Plaintiff regarding the application of guidelines similar to the UBH Guidelines. *See Stern v. Oxford Health Plans, Inc.*, No. 12-2379, 2013 WL 3762898, at *8 (E.D.N.Y. July 17, 2013) (rejecting a plaintiff's argument that the adopted guidelines could not control as they were not part of the plan); *see also S.M. v. Oxford Health Plans (N.Y.) Inc.*, 94 F. Supp. 3d 481, 508 (S.D.N.Y. 2015) (recognizing that "[c]ourts have held that this exact 'discretionary language' grants Oxford the right to establish guidelines, such as the IVIG policy, to assist with benefits determinations" (citing *Stern*, 2013 WL 3762898, at *8)), *aff'd* 644 F. App'x 81 (2d Cir. 2016) (summary order); *Krauss*, 517 F.3d at 622, 627-28 (upholding application of payment policy). The Court agrees with the *Stern* decision that the Plan's discretionary language grants an administrator, here United or its designee, the right to adopt such policies and guidelines as required to interpret the provisions set out in the Plan and to make benefits determinations. *See* 2013 WL 3762898, at *8 (noting that "[w]hile not explicitly holding as such, *Krauss* strongly suggests that this discretionary language grants defendant the right to adopt a policy, such as the GHRT Guideline, to assist with benefits determinations").[6]

_____

service providers in their discretion, Ex. A at 008, 059, and Plaintiff was well aware that United had designated UBH as the "Mental Health/Substance Use Disorder Designee" given the statements made in the denial letters as well as Plaintiff's parents' communications directly with UBH representatives.

[6] The Court notes that the discretionary language in the Plan at issue here varies from that considered by the court in *Stern*, 2013 WL 3762898, at *8 and *Krauss*, 517 F.3d at 622. However, the Court considers this a distinction without difference given that the effect of the discretionary language is the same—United, or its designees, retained discretion to make benefits determinations—and therefore, United, or its designees, could adopt policies or guidelines to guide

Regardless of the Court's conclusion on Defendant's ability to use the UBH Guidelines, Plaintiff is correct that this discretion, and the drafting of policies and guidelines to interpret terms in the Plan, is not without limits.  Other Circuits have recognized that when discretion is conferred "[a] plan administrator can rely on internal rules or policies in construing the terms of an employee benefits plan *only if* these rules or policies *reasonably interpret* the plan," *Smith v. Health Servs. of Coshocton*, 314 F. App'x 848, 859 (6th Cir. 2009) (collecting cases) (emphasis added), and such internal rules or policies cannot change the definition of a term within a plan or effectively add requirements to that definition, *Florence Nightingale Nursing Serv. Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1483-84 (11th Cir. 1995) (holding that an administrator impermissibly relied on separate guidelines not mentioned in the plan that enunciated a different definition of "medically necessary" than that contained within the plan and added an additional requirement into the administrator's analysis).  Similarly, as this Circuit has recognized, the utilization of Defendant's discretion to apply the UBH Guidelines cannot be arbitrary or capricious.  *See Krauss*, 517 F.3d at 623-24.  Thus, the questions presented are whether the UBH Guidelines "reasonably interpret the plan," improperly change the definition of "medically necessary," or were otherwise arbitrarily applied in Plaintiff's case.

Plaintiff makes only a cursory argument on these points, asserting in her reply brief that the UBH Guidelines enumerate more requirements than the APA Guidelines, and thus, *per se* contain more onerous requirements.  Doc. 37 at 3.  It is undisputed that as a practical matter the UBH Guidelines enumerate more specific requirements than those that are found within the Policy

---

and utilize the discretion conferred by the Plan.  This is so as long as United made the fact that it, or its designee, was relying on such policies clear and made such policies or guidelines available to the policyholder consistent with ERISA regulations.

definition of "medically necessary" by requiring a policyholder to meet one of three criteria and then seven additional criteria. Ex. B at 1038-42; *see also* Part I(A), *supra*. But that by definition is often what an interpretation of a plan term does. The mere fact that the UBH Guidelines have additional criteria does not necessarily mean that the UBH Guidelines are more onerous or more restrictive. This is particularly because within the definition of "medically necessary" the care required must be in accords with "generally accepted standard of medical care" and "necessary and appropriate" for treatment of the condition.[7]   It is reasonable to understand the UBH Guidelines as an interpretation, and a clarification, of what those standards are or what care is "necessary for and appropriate" to treat the condition.   In fact, Defendant asserts that is the reason for the Guidelines—that the Guidelines were meant to clarify the criteria considered in determining levels of coverage. Doc. 33 at 15-16.[8]

By contrast, Plaintiff, other than that cursory statement regarding the number of criteria, fails to articulate to this Court (1) exactly how the APA Guidelines differ from the UBH Guidelines or how the UBH Guidelines fail to reasonably interpret the Plan's definition of "medically necessary" and (2) how the UBH Guidelines added criteria that directly impacted UBH's decision in Plaintiff's

---

[7] As explained earlier in this Ruling, a service is "medically necessary" under the Plan if it is (1) "[p]rovided for the diagnosis, treatment, cure relief of a health condition, illness, injury or disease"; (2) "not for experimental investigational or cosmetic purposes," except as provided under GS 38-3-255; (3) "[n]ecessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease or its symptoms"; (4) "[w]ithin generally accepted standards of medical care in the community"; and (5) "[n]ot solely for the convenience of the Covered Person, the Covered Person's family or the provider." Ex. A at 066.

[8] Although there is no direct evidence of this in the administrative record before the Court to substantiate this assertion, *see* Ex. B at 1038-42 (reflecting the only parts of the UBH Guidelines in the record), it is consistent with the language used by Dr. Becker and Dr. Allchin in the denial letters which states that the treatment was no longer "medically necessary" per the UBH Guidelines, *see id.* at 146, 1081.

case. *C.f. Florence Nightingale*, 41 F.3d at 1483-84 (concluding that the application of guidelines existing outside of a plan was an abuse of discretion where the guidelines enunciated a different definition of "medically necessary" than contained in the plan, including an additional requirement, and the administrator injected this additional requirement into its analysis, admittedly never analyzing the elements of "medically necessary" actually listed in the plan).[9]  The Court is reluctant to find an abuse of discretion by UBH on the record before it solely based on the fact that UBH applied the UBH Guidelines to the decision to deny Plaintiff's coverage.[10]  This is especially true given the Court's conclusion *infra* that regardless of the criteria applied substantial evidence in the record supports Defendant's decision to deny coverage.

## C.    Medically Necessary Requirement

Even assuming that Plaintiff is correct and Defendant, through UBH, should not have applied the UBH Guidelines, there is substantial evidence in the record to affirm Defendant's denial of benefits both initially and on appeal.  Plaintiff's briefings attempt to explain in detail how Plaintiff

---

[9] In fact, the UBH Guidelines appear to include, in some form, consideration of the seven criteria from the APA Guidelines that Plaintiff argues were not adequately considered by Dr. Becker and Dr. Allchin.  For example, Plaintiff argues the doctors did not adequately consider her co-occurring conditions, Doc. 24-2 at 18, but UBH's Guidelines explicitly consider that one of the three requirements that can be met supporting coverage for residential treatment, Ex. B at 1038.  Some of the other APA criteria Plaintiff takes issue with, such as motivation to recover or structure being needed to eat/gain weight, Doc. 24-2 at 18, would arguably fall into the broad first criteria of UBH's Guidelines, that the person must be "experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting," Ex. B at 1038.

[10] Plaintiff makes much of the fact that neither Dr. Becker nor Dr. Allchin applied the Plan's definition of "medically necessary" to the decision to deny coverage to Plaintiff.  The denial letters however specifically refer to "medical necessity per UBH Level of Care Guidelines."  Because the Court concludes that the UBH Guidelines reasonably interpret the Plan's definition and are not inconsistent with the Plan's definition, even assuming Dr. Becker and Dr. Allchin somehow ignored the Plan's definition in reaching their decisions, there was no abuse of discretion by Defendant. Each doctor essentially applied that definition through the application of the UBH Guidelines to their decisions.

met each and every criteria for "medically necessary" treatment found in the Plan through application of the APA Guidelines.  However, Plaintiff largely ignores the evidence relied upon by Defendant, through UBH, when it made its initial denial and appellate decision.  Upon a review of the full record, it appears clear to the Court that Defendant denied benefits because treatment of Plaintiff could continue in a less restrictive setting and evidence of Plaintiff's progress, even in light of her medical history, supported that conclusion.  In fact, UBH's reviews consistently referenced stepping down Plaintiff's treatment and Avalon Hills seemed to, at least in some respects, agree with this assessment and to view Plaintiff as nearly ready to be stepped down at the time of Defendant's decision.

The Policy's definition of "medically necessary" requires that the treatment be "[n]ecessary for and appropriate to the diagnosis, treatment, cure [sic] relief of a health condition, illness, injury, disease or its symptoms" and consistent with "generally accepted standards of medical care in the community."  Ex. A at 066.  Because Defendant concluded Plaintiff could be safely, efficiently and effectively treated in a less restrictive setting, residential treatment was no longer "medically necessary" no matter how that term was interpreted by application of the APA Guidelines or the UBH Guidelines.

The Court will examine the application of the APA Guidelines in detail, but as an initial matter, the APA Guidelines state that  "[i]n general, a given level of care *should be considered* for patients who meet one or more criteria under a particular level.  These guidelines are not absolutes, however, and their application requires physician judgment."  Ex. B at 930.  The Court disagrees with Plaintiff's assertion that this means if Plaintiff meets one of the APA Guidelines' criteria recommending residential treatment that such treatment was automatically required.  A proper

application would require a physician to consider *all* of the relevant criteria.[11]

Plaintiff argues that seven criteria are relevant to the decision to deny Plaintiff coverage here: (1) medical stability, (2) motivation to recover, (3) co-occurring disorders, (4) structure needed to eat/gain weight, (5) ability to control compulsive over-exercising, (6) environmental stress, and (7) geographic availability of treatment programs.  Doc. 24-2 at 17-20.  The Court will address the evidence on each criteria below.

- Medical stability: Under the APA Guidelines, if a patient is medically stable "to the extent that more extensive medical monitoring, as defined [in higher levels] is not required" partial hospitalization can be appropriate.  Ex. B at 928.  The next highest level, residential treatment, requires that "intravenous fluids, nasogastric tube feedings, or multiple daily laboratory tests are not needed." *Id.*  Plaintiff met either of these level of care criteria.  She met the requirements detailed by the residential treatment level, but she also did not need "extensive medical monitoring." *See* Part I(D), *supra.*  Issues with her sleep behaviors that required monitoring had subsided. Ex. B at 1128.  Plaintiff had evidenced a better attitude and maintained goal weight, even though it was fluctuating.  *Id.* at 1125-37.

- Motivation to recover: Under the APA Guidelines, the partial hospitalization level of care requires that there be "[p]artial motivation" where the patient is cooperative and preoccupied with intrusive, repetitive thoughts less than three hours per day.  *Id.* at 929.  Although Dr. Boghosian of Avalon Hills did note that Plaintiff was preoccupied with certain urges and desires to restrict food and over-exercise, *id.* at

---

[11] Moreover, the Court does not, by assuming the APA Guidelines apply, agree or decide that such guidelines provide the relevant "general[] standard of medical care."

823, she also noted that Plaintiff was moving from contemplation to preparation, *id.* at 1136, and there is evidence that Plaintiff was complying with her meal plan, making progress on her awareness of her over-exercising, and had increased motivation to recover, *id.* at 546-47, 1138.  Again, this indicates that Plaintiff could also meet the lower level of care under this criteria.

- Co-occurring disorders: Under the APA Guidelines for levels of care lower than inpatient hospitalization, it simply states that the "[p]resence of comorbid condition[s] may influence choice of level of care." *Id.* at 929.  Plaintiff alleges that her bradycardia and orthostatic hypertension should be considered in continuing her treatment at the residential level of care.  However, both Dr. Becker and Dr. Allchin were aware of these co-occurring disorders at the time of their decisions, and according to Dr. Boghosian the orthostatic condition only manifested 50% of the time.  *Id.* at 1136, 1151.  Neither condition appeared sufficiently serious to Dr. Becker or Dr. Allchin to warrant residential treatment.  *See id.*

- Structure needed to eat/gain weight: Under the APA Guidelines, for residential treatment the patient must need supervision during and after all meals and for partial hospitalization the patient must need some structure to gain weight.  *Id.* at 929.  Although Dr. Boghosian opined that Plaintiff needed intense structuring and monitoring to maintain weight, *id.* at 823, there was sufficient evidence that Plaintiff was maintaining her goal weight and eating intuitively and well on her own, *id.* at 547, 823, 1136, by the time of Defendant's review, or shortly thereafter.

- Control of compulsive exercising: Under the APA Guidelines for both residential treatment and partial hospitalization, if there is "[s]ome degree of external structure

beyond self-control required to prevent patient from compulsive exercising" it can increase the level of care but this is "rarely a sole indication for increasing the level of care." *Id.* at 929.  Here, Dr. Boghosian opined that Plaintiff still engaged in these over-exercising behaviors, *id.* at 823, but there was also evidence that Plaintiff had begun to understand and control the behaviors prior to the peer review, which was noted contemporaneously by Dr. Becker in his review, and noted upon Plaintiff's discharge as occurring around the time of Dr. Becker's review or shortly thereafter. *Id.* at 546-47, 1136.

- <u>Environmental stress</u>: Under the APA Guidelines, an indication for residential treatment is that there is "[s]evere family conflict or problems or absence of family so patient is unable to receive structured treatment in home" and an indication for partial hospitalization is that "[o]thers able to provide at least limited support and structure."  *Id.* at 930.  Plaintiff's records indicate that although her family had contributed to her negative behavior prior to her admission, the family was in therapy and working with Avalon Hills actively to curb that behavior.  *Id.* at 1136.

- <u>Geographic availability of treatment programs</u>: The APA Guidelines require for partial hospitalization and lower levels of care that the patient live near the treatment while higher levels of care are needed when the treatment is too distant for the patient to participate in from home.  *Id.* at 930.  It is undisputed that there were treatment options available to Plaintiff at home, though it is disputed whether Plaintiff would have been accepted at them, and that Avalon Hills thought stepping Plaintiff down at its facility would be best, *see id.* at 824, 1136.  Moreover, the UBH

Guidelines require that UBH work to ensure a proper discharge at the new treatment level. *Id.* at 1040. There are no indications that UBH would not have done so.

Because substantial evidence supports that Plaintiff meets the criteria for partial hospitalization level of care for the criteria challenged by Plaintiff, or at least equally meets that criteria, the Court concludes that there was no abuse of discretion even assuming these APA Guidelines should have been applied.

Defendant, through UBH, reached its decision to deny coverage at the residential treatment level primarily because: (1) Plaintiff showed an increased willingness to work on joint recovery goals; (2) Plaintiff had good weight gain; (3) Plaintiff's recovery was not complicated by any ongoing serious medical or other conditions requiring 24-hour structure and monitoring; and (4) Plaintiff had improved in medical concerns. Ex. B at 1135-37. The evidence in the administrative record supports these conclusions from Dr. Becker as recounted *supra* in this Part of the Ruling and in Part I(D) of the Ruling. United specifically recounted these reasons in Dr. Becker's denial letter to Plaintiff. Ex. B at 146-47. That Plaintiff disagreed with these reasons and picks out other evidence to argue that such treatment was "medically necessary" does not demonstrate any abuse of discretion by United. *See Pagnozzi v. JP Morgan Chase & Co.*, No. 15-21249, 2016 WL 2735677, at *11 (S.D. Fl. May 5, 2016) (noting that plaintiff highlighted single episodes during a medical stay but the directors appropriately considered plaintiff's medical records as a whole in reaching a decision).

The evidence similarly supports Dr. Allchin's conclusions that Plaintiff: (1) was not a risk of harm to herself or other, (2) had no medical issues, (3) had reached an appropriate weight, (4) was participating in her recovery, (4) tolerated several out-of-state passes, (5) did not need 24-hour supervision, and (6) could have been safely treated at a less restrictive level of care such as partial

hospitalization. Ex. B at 1151-52. Dr. Allchin reviewed the full record of notes from Avalon Hills in making this determination and took into account Plaintiff's medical history. *Id.* Substantial evidence in the record also supports his conclusions. *See* Part I(D), *supra*. Again, on the record before this Court, there was no abuse of discretion by Defendant in ultimately making this determination.

The reasons and evidence relied upon by both Dr. Becker and Dr. Allchin are also consistent with the application of the UBH Guidelines and the conclusion that Plaintiff failed to meet any of the three criteria required for residential treatment. As recounted in Part I(A) of the Ruling, the UBH Guidelines provide that an insured must be: (1)"experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting"; (2) at "an imminent risk that severe, multiple and/or complex pychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of functioning to undermine treatment in a lower level of care"; or (3) suffering from "co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition" in order to qualify for residential treatment. Ex. B at 1038. Although Dr. Becker's and Dr. Allchin's stated reasons for denying coverage do not directly reference these UBH Guidelines, their reasons are consistent with Plaintiff not meeting any of the three criteria. For example, because Plaintiff had maintained goal weight and had a more positive attitude she was not "experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting." *See id.*

In reaching this conclusion, the Court does not discount the evidence put forth by Plaintiff that Plaintiff had continued to over exercise, had a complicated family medical history and life at home, struggled to comply with her meal plan requirements at times, was not fully motivated to

recover, required structure and monitoring, and suffered from bradycardia and othorstatic hypotension around the time of, or within a few weeks prior to, UBH's decision. *See* Doc. 24-2 at 17-20. Plaintiff clearly struggled for years and continued to suffer even while in treatment at Avalon Hills for her mental illness. The Court fully appreciates the complications and intricacies involved in effectively treating such a complicated illness. However, UBH's conclusions were equally supported by the record before Dr. Becker when he conducted his peer-to-peer review and by the full record before Dr. Allchin when he made his appeal determination.

In summary, substantial evidence in the administrative record supports Defendant's decision to deny coverage under the Policy to this Plaintiff. The Court is not able to set that decision aside as arbitrary or capricious. In *Kruk v. Metropolitan Life Insurance Company*, 567 F. App'x. 17, 20 (2d Cir. 2014) (summary order), the Second Circuit said in affirming the district court's summary judgment denying ERISA coverage: "In short, the question is not whether the record would have permitted a plan administrator to find otherwise, but whether the record compelled the different conclusion urged by [plaintiff]. Like the district court we conclude it does not." This case reaches the same result for the same reason.

These are hard cases, troubling the spirit because the human suffering is severe. However, for the reasons stated, and in light of governing authority, the Court is constrained to deny Plaintiff's motion for summary judgment and grant that of the Defendant. There is enough evidence in the record for a reasonable person to conclude that there was support for both Dr. Becker's and Dr. Allchin's conclusions denying coverage to Plaintiff. *See Kruk*, 567 F. App'x at 20; *Guad-Figueroa*, 771 F. Supp. 2d at 215. This is true even assuming that the APA Guidelines should have influenced Defendant's decisions. Thus, Defendant is entitled to summary judgment dismissing Plaintiff's claim.

### D.      Sufficiency of UBH's Explanation

Plaintiff, at various points in the briefings before the Court, appears to argue that Defendant's justifications for denying benefits were not sufficiently conveyed or articulated to Plaintiff.  In particular, Plaintiff asserts that UBH did not explain what criteria from the UBH Guidelines were applied and whether the definition of "medically necessary" applied from the Policy.  Although courts have found insufficient or conclusory statements of reasons may be arbitrary and capricious, *see Mirto v. Amalgmated Retail Ins. Fund*, 882 F. Supp. 1386, 1390 (S.D.N.Y. 1995), UBH's statements here supplied Plaintiff with sufficiently specific reasons for denying her continued coverage at the residential treatment level.  *See W. V. Empire Healthchoice Assurance, Inc.*, No. 15-5250, 2016 WL 5115496, at *17 (S.D.N.Y. Sept. 15, 2016) (finding an explanation similar to that provided by UBH here sufficient in an administrator's denial of coverage for treatment related to an eating disorder).  Here, UBH's letters focused on the fact that Plaintiff had an improved attitude, had gained a substantial amount of weight, was able to be treated in a less restrictive environment, and focused on her progress, explaining that coverage would be initially approved for partial hospitalization treatment.  *See id.*[12]

## V.      Plaintiff's Second Claim

Count Two of Plaintiff's Complaint seeks restitution of all past due benefits, a mandatory injunction to qualify for benefits due and owing, and unspecified additional relief.  Doc. 1 at 6. Defendant has also moved for summary judgment on this claim, arguing that such relief is not proper

---

[12] UBH also properly complied with ERISA regulations by including a statement that Plaintiff could request and obtain the criteria use to make the determination.  *See* Ex. B at 148. ERISA only requires that a benefit determination be explained (1) using and referencing the specific criteria used to reach such a conclusion *or* (2) a statement that such criteria/guidelines were used and such criteria/guidelines will be made available to the policyholder.  *See, e.g.*, 29 C.F.R. § 2560.503-1(g)(v)(A), *see also* 29 U.S.C. § 1133.

under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  Doc. 29 at 24-25.  Plaintiff argues that the

claim is pled in the alternative and survives if the Court agrees with Defendant on the first claim.

Doc. 35 at 14-15.  Defendant responds that the relief requested by Plaintiff is not warranted and

granting such relief would be improper and contrary to the ERISA Plan terms.  Doc. 36 at 9-10.

Having concluded that Defendant is entitled to summary judgment on the first claim and that

Defendant's decision was neither arbitrary nor capricious, the Court sees no basis upon which to

consider or grant Plaintiff's alternatively pled equitable claim.  As such, the Court grants summary

judgment to Defendant on this claim.[13]

## VI.    Conclusion

For the foregoing reasons, Defendant's [25] *Motion for Summary Judgment* is GRANTED

in full and Plaintiff's [24] *Motion for Summary Judgment* is DENIED in full.  The Clerk is directed

to enter Judgment in favor of Defendant and close the file.

**It is SO ORDERED.**

**Dated: New Haven, Connecticut**
**March 30, 2017**

_____/s/ Charles S. Haight Jr._____
**Charles S. Haight, Jr.**
**Senior United States District Judge**

---

[13] In Plaintiff's briefing, she appears to allege that she is asserting a cause of action under 29 U.S.C. § 1132(a)(3) which provides for a cause of action for "other appropriate equitable relief." Even considering it such a claim, Plaintiff is still not entitled to relief based upon this Court's conclusion regarding its first claim.

-33-